## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 17 2019, 9:19 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Joel M. Schumm
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caryn N. Szyper
Deputy Attorney General
Indianapolis, Indiana

## IN THE
## COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Anthony Gammons, Jr., *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, *Appellee-Plaintiff.* | October 17, 2019 <br><br> Court of Appeals Case No. 18A-CR-3005 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Mark D. Stoner, Judge <br><br> Trial Court Cause No. 49G06-1706-F1-21991 |

**Altice, Judge.**

# Case Summary

Anthony Gammons shot Derek Gilbert six times, and Gilbert survived. Following a jury trial, Gammons was found guilty of Level 1 felony attempted murder and Class A misdemeanor carrying a handgun without a license. Gammons raises two issues on appeal, which we restate as:

> I. Did the trial court commit reversible error because its jury instruction on self-defense included language that self-defense was not available to Gammons if he was committing a crime that was "directly and immediately related to" the confrontation?

> II. Is Gammons entitled to a new trial because, after trial, the trial court could not produce for Gammons a copy of a jury note that was sent to the court during deliberations?

We affirm.

# Facts & Procedural History[1]

On the evening of June 6, 2017, Gammons and Gilbert both attended a neighborhood social gathering, although they did not arrive together. They had known each other for fifteen years or so and as teenagers had been friends, but had not seen each other for about ten years. At some point, they saw each other at the gathering and verbally argued. Gammons, who concedes that he

---

[1] We heard oral argument at Norwell High School in Ossian, Indiana on September 24, 2019. We thank the administrators, students, and judges in attendance for their hospitality, and we commend counsel for their excellent written and oral advocacy.

did not possess a license to carry a handgun, had a handgun on his waistband; Gilbert was not armed. According to Gilbert, after the verbal exchange concluded, they shook hands and Gilbert started walking to his car. He testified that when he tried to open his car door, he realized he had been shot in the arm, and he "turned around" and saw Gammons shooting at him. *Transcript Vol. II* at 59. Gilbert thought the argument "was over with" and said, "[I]f I felt like I was in harm's way I wouldn't never turned my back from him at all." *Id.* at 64. Gammons fired eight shots, hitting Gilbert six times, with some shots striking Gilbert in the lower back and buttocks. After shooting Gilbert, Gammons left the scene and disposed of the gun.

[4]     Gammons's version of the encounter differed. According to Gammons, Gilbert – who Gammons described as someone who "starts trouble" and fights people when he gets drunk – approached Gammons as soon as he arrived at the gathering and asked him what he was doing there. *Id.* at 249. Gammons described Gilbert as very intoxicated, aggressive, and "acting all crazy." *Transcript Vol. III* at 11. Gammons testified that he kept telling Gilbert to back up, but Gilbert told him, "you looking like you casket ready," which Gammons understood to mean that Gilbert wanted to kill him. *Id.* at 7. Gammons knew that Gilbert had previously been charged with murder. When Gammons saw Gilbert "kind of pulling up his pants," Gammons was "convinced . . . that [Gilbert] was either going for a weapon or he was trying to do something to harm [him]." *Id.* Gammons stated that he felt threatened and grabbed his handgun and shot at Gilbert. Gammons testified that "[Gilbert] kind of like

spun around but [] kept aggressing towards me," so Gammons kept shooting until he saw Gilbert "retreat and run away[.]" *Id*. at 8. Gammons acknowledged that he was visibly wearing a handgun on his hip. When asked, "[Gilbert] could see your gun, right?", Gammons replied, "Right." *Id*. at 13. He said that he did not know whether Gilbert had a gun, but had seen him "reaching" for something. *Id*.

[5] Gilbert testified at trial that he was not aggressive with Gammons, did not threaten him, and was not carrying a gun, explaining, "If I had a gun and this dude was shooting me, we both would be dead now. Seriously. I would have defended myself." *Id.* at 84. Gilbert's testimony did not indicate whether he saw Gammons's gun before Gammons fired. Gilbert survived, but underwent at least twelve surgeries and sustained permanent injuries. On or around June 12, police tracked Gammons via his cell phone, and after a standoff with police and SWAT, Gammons surrendered and was taken into custody.

[6] On June 13, 2017, the State charged Gammons with attempted murder and carrying a handgun without a license. A two-day jury trial was held on May 21-22, 2018. Gammons's defense was that he shot Gilbert in self-defense. In addition to his own testimony, he elicited testimony from two females who had been at the gathering. They testified that Gilbert was intoxicated and aggressive with Gammons.

[7] Gammons tendered an instruction on self-defense, and, after reviewing it, the court advised that it had an "extensive self-defense one" that included the

language of Gammons's proposed instruction.[2] *Transcript Vol. II* at 244. The parties reviewed the trial court's self-defense instruction, Instruction 7b, which included the following language, now at issue in this appeal: "A person may not use force if: . . . he is committing a crime that is directly and immediately related to the confrontation[.]" *Appellant's Appendix Vol. II* at 110. Gammons stated that he had no objection to the court's self-defense instruction. *Transcript Vol. II* at 246. However, after Gammons testified and the defense rested, Gammons objected to the trial court's self-defense instruction, arguing that the court's instruction "may cause confusion" due to the "directly and immediately related to the confrontation" language. *Transcript Vol. III* at 25. The court responded that its instruction was a correct statement of law, denied Gammons's request to give his tendered instruction, and gave Instruction 7b.

[8] Thereafter, the parties presented closing argument. The State's closing included the following with regard to self-defense:

---

[2] Gammons's proposed instruction read:

USE OF FORCE TO PROTECT PERSON OR PROPERTY

It is an issue whether Anthony Gammons Acted in self-defense of himself.

Anthony Gammons may use reasonable force against another person to protect himself from what he reasonably believes to be the imminent use of unlawful force.

Anthony Gamons [sic] is justified in using deadly force, and does not have a duty to retreat, only if he reasonably believes that deadly force is necessary to prevent serious bodily injury to himself and to prevent the commission of the forcible felony battery against himself.

The State has the burden of proving beyond a reasonable doubt that Anthony Gammons did not act in self-defense.

Authority: IN Pattern Instruction No. 10.0300, I.C. 35-41-3-2.

*Appellant's Appendix Vol. III* at 102.

So, let's talk about self-defense. You're gonna get a jury instruction, 7-B. It's gonna explain the law of self-defense to you. Here are the highlights. What has to be reasonable for self-defense to apply? The defendant's fear has to reasonable. The force he uses has to be reasonable. And it has to be necessary to prevent serious bodily injury. Ladies and gentleman, his actions were not reasonable and self-defense does not apply. You also can't be doing anything illegal at the time and you're gonna note *that a person may not use force if he is committing a crime that is directly and immediately related to the confrontation*. Such as, carrying a handgun without a license, which he admitted to. Self-defense does not apply here.

*Id.* at 27 (emphasis added).

[9] The case was sent to the jury around 4:10 p.m., and after the jury retired to deliberate, the trial court told the attorneys, "Parties just make sure the bailiff has your cell phone numbers. If there's a question from the jury, I'll call you and communicate the question[.]" *Id.* at 45. Around 8:00 p.m., the jury sent a note to the trial court with a question. The trial court contacted the attorneys by phone, advised them of the question, and told them that the court would tell the jury to continue to deliberate.

[10] At about 10:50 p.m., and right before the jury was brought back into the courtroom for the verdict, defense counsel argued on the record that the trial court did not handle the jury question properly and should have brought the jury back into the courtroom and re-read the instructions. The exchange between the trial court and defense counsel was:

DEFENSE COUNSEL: The jury went out at -- on behalf of Mr. Gammons, the jury went out at 4:10 p.m. *I received a call from this court at 7:59 p.m. saying that the jury -- jury could not reach a verdict.* I believe the appropriate protocol would have been Hernandez versus State, 761 N.E. 2d 845-852, Indiana 202, in which the court should have . . . called the jury back into the court, in the presence of all parties and their counsel. Reread all the instructions given to them prior to deliberations without emphasis on any of them without further comment. I believe at 7:59 p.m. that should -- that they should have been given that -- brought back into the courtroom in the presence of all parties, instructions reread but instead they were not and they were –

COURT: I'd like to make it very clear that that's not exactly what happened. *What happened was at 7:59 p.m. the jury sent back a note saying, what if we can't reach an agreement. They didn't say they were at an impasse*, as a matter of fact I did not question they were at an impasse. My response to them, after consulting with the attorneys as I called them, and I informed them that my answer would be to *the question, which is, **if** we cannot reach a verdict*? The answer was, continue to deliberate. At that point, this is a level 1 felony, it was a two-day trial. They had been out for approximately three hours, possibly almost four hours at that point and time. . . . Frankly, telling them to deliberate more, that is the procedure are going to -- that we were going to follow at that point and time. . . . [F]rom what I understand there is a verdict and let us go ahead and bring the jury back in.

*Id.* at 46-47 (emphases added). The jury found Gammons guilty of Level 1 felony attempted murder and Class A misdemeanor carrying a handgun without a license.[3]

[11] About one month after trial, on June 18, 2019, Gammons filed a Motion for Copy of Jury Note and the Court's Response Thereto, and the trial court granted the motion the same day. After searching and not being able to locate the note, Judge Marc Rothenberg issued an order on July 11, 2018 (July Order) in which the court outlined the circumstances of the situation, including what was on the jury's note and what the court's response had been, stating, in part, the following:

> 2) Once the case was given to the Jury for deliberation, while still in the Courtroom, on the record, the parties showed no objection to handling any questions by the Jury during deliberation with the following process:
>
> > a. Upon receipt of a question, the Judge would contact the attorneys by phone, and discussing how to respond to any question asked;
> >
> > b. Then the response, if any, would be communicated back to the Jury in writing.
>
> 3) During the deliberation, at approximately 8:00 PM the Jury sent a note to the Court with a single question on it, "What if we

---

[3] The State did not pursue Level 5 felony enhancement of the gun offense.

can't come to an agreement?" This question was written on a full page from a yellow legal pad.

4) Once the question was received, the Court, per a process that neither party objected to, contacted both attorneys and communicated the question, and indicated that the Court is inclined to respond with "Continue to deliberate." This response was written on the lower half of the yellow paper on which the question was written.

5) The question that was written on the paper, and the Court's response was memorialized on the record, in open court, prior to the jury returning its verdict on 5/22/18 at approximately 10:50 PM.

* * *

8) After a diligent search, the Court has been unable to find the requested question, and its whereabouts are unknown. Again, it should be noted that the question asked by the jurors, and the answer that was given to the jurors, were memorialized on the record on 5/22/18.

*Appellant's Appendix Vol. III* at 146-47.

[12] The day before the sentencing hearing, Gammons filed a Response and Objection to the July Order and, along with it, tendered Defense Counsel's Verified Statement of Evidence Regarding the Jury Note and the Trial Court's Communication with the Jury During Deliberations (Statement). The Statement objected to the trial court's recollection of events (as memorialized in the July Order) and averred, among other things, that:

3. The Court did not make a record of the time the Court received the jury communication; from whom the Court received the communication and how that person may have communicated with the jury. The Court did not make a copy of the original note and the Court's response.

4. While the Court communicated with Counsel for Mr. Gammons during this process generally, the Court did not share the specific communication from the jury and only stated how it would respond.

*Id*. at 148. The Statement also indicated that, during the phone call with the trial court and opposing counsel, defense counsel did not recall the court using the language of "What if we cannot come to an agreement?" and, rather, recalled the trial court describing the jury question differently, which she said was evidenced by the following text that she sent to her attorney colleague at 7:59 p.m.:

The Judge just called! *The Jurors sent a note saying they cannot reach a verdict*! His response is that is [sic] has only been 4 hours; so keep deliberating.

*Id*. at 149 (emphasis added). Contemporaneously with the Response and Statement, Gammons filed a Motion to Vacate Jury Verdict, Motion for New Trial, and Motion to Correct Errors, raising various issues, including that the trial court "erred in responding to the jury note and failing to give defense an opportunity to object and make a record." *Id*. at 161.

[13]   On July 20, the parties appeared for sentencing, but first the court addressed the pending motions/pleadings concerning the jury note. The trial court advised that it took exception to defense counsel's statement "to the point where I believe you are questioning the integrity of the court." *Transcript Vol. III* at 52. Regarding Gammons's allegation that the court did not share the specific communication from the jury with the lawyers in the phone call, the court said that it had read "the exact words that were on that piece of paper" and that the jury did not say that it "couldn't" reach a verdict, and the juror's question was "what if we cannot come to an agreement" or "what if we can't come to a verdict." *Id.* at 53-54, 55. The trial court took issue with "the attitude and language" of Gammon's Response and Statement, which the court found "blatantly accuses this court of impropriety and essentially creating falsehoods in the record." *Id.* at 57. Judge Rothenberg advised the parties that he would be recusing. *Id.* at 57. The matter was later reassigned to Judge Mark Stoner.

[14]   At a hearing on November 29, 2019, Judge Stoner addressed the jury note issue and Gammons's pending motion to vacate and for a new trial. With regard to the jury note and the trial court's call to counsel, the prosecutor said, "My position is that . . . our jury never indicated they were at an impasse. They asked a hypothetical question about what might occur if they were at an impasse." *Transcript Vol. III* at 81. Defense counsel maintained that the trial court told them in the phone call that the jury was at an impasse, and she further argued that the loss of the note, in and of itself, was prejudicial and required a new trial.

The trial court acknowledged that the loss of the note was "troubling," but found that under the circumstances it was not so prejudicial as to require a new trial. *Id.* at 96. The court observed that the jury had been out for less than four hours and that the trial court's direction to continue to deliberate was the proper response at that time. The court concluded that "even if the jury indicated that they were at an impasse," the trial court was within its discretion to order the jury to continue to deliberate. *Id.* at 102.

The trial court denied Gammons's motion to correct error and sentenced Gammons to thirty-two years, with four suspended, for Level 1 felony attempted murder.[4] Gammons now appeals.

# Discussion & Decision

## I. Self-Defense Instruction

Gammons argues that the trial court's instruction to the jury on self-defense was an incorrect statement of law and that a new trial is required. The trial court has broad discretion as to how to instruct the jury, and we generally review that discretion only for abuse. *Kane v. State*, 976 N.E.2d 1228, 1231 (Ind. 2012). An abuse of discretion occurs if the instructions, considered as a whole and in reference to each other, mislead the jury as to the applicable law. *Smith v. State*, 777 N.E.2d 32, 34 (Ind. Ct. App. 2002), *trans. denied*. "In reviewing a trial

---

[4] The trial court did not impose a sentence for carrying a handgun without a license, merging it with the attempted murder conviction.

court's decision to give or refuse tendered jury instructions, we consider: '(1) whether the instruction correctly states the law; (2) whether there is evidence in the record to support the giving of the instruction; and (3) whether the substance of the tendered instruction is covered by other instructions that are given.'" *Id.* (quoting *Chambers v. State*, 734 N.E.2d 578, 580 (Ind. 2000), *trans. denied*. "Where, . . . as here, the appellant's challenge to the instruction is based on the first of our three considerations – an argument that the instruction was an incorrect statement of the law – we review the trial court's interpretation of that law de novo." *Kane*, 976 N.E.2d at 1231. Errors in the giving or refusing of instructions are harmless where a conviction is clearly sustained by the evidence and the instruction would not likely have impacted the jury's verdict. *Randolph v. State*, 802 N.E.2d 1008, 1013 (Ind. Ct. App. 2004), *trans. denied*.

[18] A valid claim of self-defense is a legal justification for an otherwise criminal act. *Mayes v. State*, 744 N.E.2d 390, 393 (Ind. 2001). Indiana's self-defense statute, Indiana Code § 35-41-3-2, provides that a person is justified in using reasonable force against any other person to protect the person or a third person from what the person reasonably believes to be the imminent use of unlawful force. I.C. § 35-41-3-2(c). Further, a person (1) is justified in using deadly force and (2) does not have a duty to retreat if the person reasonably believes that that force is necessary to prevent serious bodily injury to the person or a third person or the

commission of a forcible felony. *Id.* However, Subsection (g)[5] provides in relevant part:

> [A] person is not justified in using force if:
>
> > (1) *the person is committing* or is escaping after the commission of *a crime*;
>
> > (2) the person provokes unlawful action by another person with intent to cause bodily injury to the other person; or
>
> > (3) the person has entered into combat with another person or is the initial aggressor unless the person withdraws from the encounter and communicates to the other person the intent to do so and the other person nevertheless continues or threatens to continue unlawful action.

(Emphases added). Our Supreme Court, in construing this statute, has stated that the legislature is presumed to have intended the language it used to be applied logically and not to bring about an unjust or absurd result. *Mayes*, 744 N.E.2d at 383. Further, we "conventionally construe penal statutes strictly against the State." *Id.*

---

[5] The statute cited is that which was in effect from April 1, 2013 to April 25, 2019, which covers the time period during which Gammons was charged and tried.

Here, the trial court rejected Gammons's tendered instruction, finding that it was covered by the trial court's self-defense instruction. The trial court gave, over Gammons's objection, Instruction 7b, which provided:

Instruction Number 7b

It is an issue whether the Defendant acted in self-defense.

A person is justified in using reasonable force against another person to protect himself or a third person from what the person reasonably believes to be the imminent use of unlawful force.

However, a person is justified in using deadly force and does not have a duty to retreat, if he reasonably believes that deadly force is necessary to prevent serious bodily injury to himself or a third person or to prevent the commission of a felony.

*A person may not use force if:*

*He is committing a crime that is directly and immediately related to the confrontation;*

He enters into combat with another person or is the initial aggressor unless he withdraws from the encounter and communicates to the other person the intent to do so and the other person nevertheless continues or threatens to continue unlawful action; or

That the Defendant was in a place where he had no right to be.

The State has the burden of proving beyond a reasonable doubt that the Defendant did not act in self-defense.

*Appellant's Appendix Vol. III* at 110 (emphasis added).

[20]   On appeal, Gammons argues that the trial court erred by instructing the jury that self-defense was not available to Gammons if he was committing a crime (here, carrying a handgun without a license) that was directly and immediately related to the confrontation.  More specifically, his position is that the "related to" language of Instruction 7b was an incorrect statement of law based on caselaw interpreting the self-defense statute, which, he argues, requires that the crime "have a causal link" to the confrontation.[6]  In support of his argument, Gammons refers us, in part, to our Supreme Court's decision in *Mayes*, where the defendant was charged with murder and misdemeanor carrying a handgun without a license and, at trial, the trial court gave, over Mayes's objection, a self-defense instruction based on the statutory definition of self-defense, stating that a person is not justified in using force "if he is committing . . . a crime[.]" *See* I.C. § 35-41-3-2.  On appeal, Mayes claimed that the possession of an unlicensed handgun was not the type of offense that should negate a claim of self-defense.

---

[6] We note that, at trial, Gammons did not initially object to the trial court's instruction, but later, after defense rested, Gammons objected, arguing that the "immediately related to" language "may cause confusion" and was problematic. *Transcript Vol. III* at 25.  The trial court noted the objection but found Instruction 7b was "the correct statement of the law." *Id.*  Although on appeal Gammons's argument is more precise and asserts that Indiana caselaw requires a "causal nexus," *Reply Brief* at 7, and that the "relate to" language does not satisfy that requirement, we find that his objection and argument was adequate to inform the trial court of his claim and preserve his issue for appeal. *See Kane v. State*, 976 N.E.2d 1228, 1232 (Ind. 2012) (finding objection was enough to show that trial judge considered whether instruction was an incorrect statement of law and to preserve for appeal an objection to the instruction on that ground).

[21] Our Supreme Court agreed, observing that the language of Indiana's self-defense statute "essentially provides that the defense is not available to a person who is committing a crime," but that "a literal application of the contemporaneous crime exception would nullify claims for self-defense in a variety of circumstances and produce absurd results in the process."[7] *Mayes*, 744 N.E.2d at 393. The *Mayes* Court held:

> We conclude that because a defendant is committing a crime at the time he is allegedly defending himself is not sufficient standing alone to deprive the defendant of the defense of self-defense. *Rather, there must be an immediate causal connection between the crime and the confrontation.* Stated differently, the evidence must show that *but for the defendant committing a crime, the confrontation resulting in injury to the victim would not have occurred*.

*Id*. (emphases added).

[22] Gammons urges that Instruction 7b's language that the crime cannot be "related to the confrontation" sets the bar too low and "impermissibly dilutes" our Supreme Court's requirement that the crime have an "immediate causal connection" or "produce" the confrontation. *Appellant's Brief* at 14, 17-18. Assuming without deciding that Gammons is correct, we conclude that any error was harmless because Gammons shot at an unarmed man eight times,

---

[7] The *Mayes* Court provided the following example: Had Mayes shot his girlfriend the minute before his handgun license expired, he would have been able to assert a claim of self-defense, but, had he shot her a minute later, the claim would have been unavailable to him. The Court observed, "The legislature could not have intended that a defense so engrained in the jurisprudence of this State be dependent upon the happenstance of such timing." 744 N.E.2d at 394.

with some shots piercing Gilbert in the back and buttocks, and, therefore, the jury could not have found he acted in self-defense. In reaching this decision, we find our court's decision in *Fuentes v. State*, 952 N.E.2d 275 (Ind. Ct. App. 2011), *trans. denied*, to be instructive.

[23] In *Fuentes*, an argument between Fuentes and two men occurred inside a gas station, initially beginning as an exchange of words and then, after exiting into the parking lot, becoming physical. Fuentes pulled out his illegally-possessed handgun and shot Ronald Grayson in the arm. Grayson fell to his knees and raised his arms and Fuentes shot him again, killing him. The State charged Fuentes with murder and Class C felony carrying a handgun without a license. At trial, Fuentes tendered a self-defense instruction, which stated, in part, that a person may not use force if he or she is committing a crime "that directly and immediately produced the confrontation where the force was used[.]" *Id*. at 277. The trial court did not give the tendered instruction and instead gave an instruction that largely tracked the relevant statutory language that a person may not use force if he is committing a crime.

[24] On appeal, the *Fuentes* court found that, although the trial court's instruction tracked the language of the statute and was "correct as far as [it] went," the instruction was "incomplete" because, under *Mayes*, "the simple fact that a defendant is committing a crime at the time he is allegedly defending himself 'is not sufficient standing alone to deprive the defendant of the defense of self-defense' and 'there must be an immediate causal connection between the crime and the confrontation.'" *Id*. at 278-79 (quoting *Mayes*, 744 N.E.2d at 394). The

*Fuentes* court found that "[t]his omission of the judicial gloss on the statutory language effectively deprived Fuentes of his only defense." *Id*. at 279. The court found that Fuentes's tendered instruction on self-defense was "an accurate and, more importantly, complete statement of the law, which the record supported giving and which was not covered by other instructions, and . . . it was error to refuse to give it." *Id*. at 279. However, the *Fuentes* court determined that the error was harmless because, after Fuentes shot Grayson the first time, Grayson fell to his knees and put his hands up, and Fuentes shot him again. The *Fuentes* court determined that under these facts "the jury could not have properly found that Fuentes acted in self-defense when he shot Grayson a second time." *Id*. at 280.

[25] Here, Gammons, using his illegally-possessed handgun, shot an unarmed Gilbert eight times, hitting him six times, some of which entered through his back and buttocks. Like the *Fuentes* court, we find any error in the trial court's self-defense instruction to be harmless.[8] *See Fuentes*, 952 N.E.2d at 280; *see also*

---

[8] Gammons also asserts that Instruction 7b "is at odds" with or "raises concerns" under Indiana's right to bear arms constitutional provision, Article 1, Section 32 of the Indiana Constitution. *Appellant's Brief* at 13, 20. He argues that "[e]xtinguishing the right to self-defense simply because one is carrying a handgun without a license is a material and impermissible impairment on the right to bear arms." *Id*. at 22. Gammons concedes that he did not object to the trial court's instruction on this basis and would need to demonstrate fundamental error. As we have found any error in the instruction to be harmless in this case, Gammons cannot demonstrate fundamental error. Moreover, the right to bear arms is not absolute. Our court has held that "the core value embodied by Section 32 is the right for law-abiding citizens to bear arms for self defense." *Lacy v. State*, 903 N.E.2d 486, 490 (Ind. Ct. App. 2009), *trans. denied*. Gammons was not a law-abiding citizen when he shot Gilbert, given that he was illegally carrying a handgun. We are not persuaded that the trial court's instruction was violative of Article 1, Section 32 of the Indiana Constitution.

*Randolph*, 802 N.E.2d at 1015 (finding that any instructional error was harmless, and thus counsel was not ineffective, where defendant shot victim multiple times, and because "[f]iring multiple shots undercuts a claim of self-defense," there was overwhelming evidence before the jury that defendant's claim of self-defense was without merit).

## II. Jury Note

The parties agree to the following: (1) about four hours into deliberations, the jury sent a question to the trial court, (2) the trial court contacted the attorneys for both parties by phone, pursuant to an agreed procedure, to advise that the jury had a question, (3) in response to the question, the trial court told the jury to continue deliberating, (4) several hours later, and after the jury was done deliberating but before the verdict was read, defense counsel made a record that it was Gammons's position that the trial court did not handle the jury's question properly, arguing that the court should have re-read all instructions to the jury, (5) the trial court lost or did not keep the note with the jury's question, but should have, and (6) neither party ever saw it.

On appeal, Gammons likens the loss of the note to extraneous influences on a jury which "fundamentally compromises the appearance of a fair trial" and argues that a presumption of prejudice should arise. *Appellant's Brief* at 24. He maintains, "[B]ecause the content of the note cannot be known[,] . . . its effect on the fairness of deliberations cannot be determined[,]" and a new trial is thus required. *Appellant's Reply Brief* at 14. We disagree.

[28]   First, after a copy of the note was requested (a month after trial) by Gammons but could not be located, Judge Rothenberg (who presided at trial) issued the July Order outlining the court's recollection of the circumstances of the question and its response thereto, stating that the jury question was "what if we can't come to an agreement" or verdict. *Appellant's Appendix Vol. III* at 146. The prosecutor agreed that this was the substance of what was conveyed to the lawyers in the phone call. Thus, this is not a situation where no one recalls the jury's question, and we reject Gammons's suggestion that that the contents "cannot be known." *Appellant's Reply Brief* at 14.

[29]   Second, after Judge Stoner took over the case and following a hearing, the court determined that, even if the jury question had indicated that the jury was at an impasse, Judge Rothenberg's directive to the jury to keep deliberating was not an abuse of discretion given that the jury had only been out for four hours in an attempted murder trial. We find that this decision was consistent with our Supreme Court's decision in *Treadway v. State*, 924 N.E.2d 621 (Ind. 2010), where Treadway was convicted following a jury trial of murder, felony murder, robbery, and battery, and, on appeal, the Court addressed, among other things, the issue of whether the trial court erred by instructing the jury to continue deliberating.

[30]   In that case, the jury sent out a note after six hours of deliberation, stating that it had not reached a consensus and asking, "[W]hat does the process require at this point?" *Id.* at 631. By agreement of the parties, the court brought the jury back into the courtroom and polled them individually asking each whether,

with more time, he or she "could reach a decision, an agreement, unanimous decision on any of the four counts?" *Id*. Only one juror responded in the affirmative. The trial court released the jury back to the jury room, and Treadway moved for a mistrial. Effectively overruling that motion, the trial court determined that it would "give them more time" and that it would be sending the bailiff into the jury room with the instruction that "the judge said to please continue deliberating." *Id*. Treadway objected "to any such instruction." *Id*.

[31] In ultimately determining that the trial court's directive to continue deliberating was not erroneous, the Court referred to and relied on Indiana's Jury Rules, under which trial courts are given "greater leeway 'to facilitate and assist jurors in the deliberative process, in order to avoid mistrials.'" *Id*. at 631 (quoting *Ronco v. State*, 862 N.E.2d 257, 259 (Ind. 2007)). In particular, Ind. Jury R. 28 gives trial courts authority, when the jury advises the court they are at an impasse, to poll the jurors in the presence of counsel and the parties, and to "direct that further proceedings occur as appropriate." Our Supreme Court in *Ronco* emphasized that a "question is not an impasse," and "[i]ndication of an impasse must come from the jury's leader or from the jury as a whole." *Ronco*, 862 N.E.2d at 260.

[32] Based on the record before us, the jury's inquiry was either (1) a question, asking "what if we cannot reach an agreement/verdict?", or (2) a statement, indicating that the jury could not reach a verdict. The trial court and the prosecutor recalled it as being the former, which was a question (thus not an

impasse, per *Ronco*), and the trial court's direction to keep deliberating was not improper. However, even if it was the latter, as Gammons claims, we find that, where, as here, the jury had only been deliberating less than four hours, it was not erroneous for the trial court to tell the jury to continue to deliberate, and, accordingly, a new trial is not warranted.

[33] Judgment affirmed.

Kirsch, J. and Pyle, J., concur.